Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Sarah R. London (CSB No. 267083)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Lynn Lincoln Sarko
(*Admitted Pro Hac Vice*)
Gretchen Freeman Cappio
(*Admitted Pro Hac Vice*)
Daniel Mensher
(*Admitted Pro Hac Vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile:   (206) 623-3384

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
Lisa Faye Petak (CSB No. 300914)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone:  (805) 456-1496
Facsimile:  (805) 456-1497

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
David L. Cousineau (CSB No. 298801)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805) 564-2444
Facsimile:   (805) 965-5950

*Lead Trial Counsel*

William M. Audet (CSB No. 117456)
Ling Y. Kuang (CSB No. 296873)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Lead Counsel for Plaintiff Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual. BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual. CAPTAIN JACK'S SANTA BARBARA TOURS, LLC, a California limited liability company, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET. LLC., a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an individual, JACQUES HABRA, an individual, ISURF, LLC, a California

**Case No.  2:15-cv-04113-PSG-JEM**

[Consolidated with Case Nos. 2:15-CV- 04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051- PSG (JEMx)]

**REBUTTAL DECLARATION OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO PLAINS' MOTION TO STRIKE**

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE

limited liability company, MARK KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG MUH, an individual, OCEAN ANGEL IV, LLC, a California limited liability company, PACIFIC RIM FISHERIES. INC, a California corporation, SARAH RATHBONE, an individual, COMMUNITY SEAFOOD LLC, a California limited liability company, SANTA BARBARA UNI, INC., a California corporation, SOUTHERN CAL SEAFOOD, INC., a California corporation, TRACTIDE MARINE CORP., a California corporation, WEI INTERNATIONAL TRADING INC., a California corporation and STEPHEN WILSON, an individual, individually and on behalf of others similarly situated,

Plaintiffs,

v.

PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,

Defendants.

Date:       February 5, 2018
Time:       1:30 p.m.
Location:   Courtroom 6A
Judge:      Hon. Philip S. Gutierrez

I, IGOR MEZIĆ, Ph.D, hereby declare:

1.     I submitted a declaration in support of Plaintiffs' Renewed Motion for Class Certification on July 12, 2017 [Docket 300]. I submit this declaration to respond to the critiques Plains and its experts made of my work in this case and of the predictions of my model of the maximum oiling on the shoreline from Line 901. Relevant extracts of the deposition transcripts cited in this declaration are attached as Exhibits to the concurrently filed Declaration of Juli Farris.

**My Use of SCAT to Determine Volume of Oil on the Shoreline is Correct**

2.     Dr. Boehm claims "Mezic's use of observation data collected pursuant to the Shoreline Cleanup Assessment Technique (SCAT) to determine volumes of oil on shorelines is unreliable, given the uncertainties inherent in the data and especially given that use of SCAT data for his purpose is regarded as inappropriate by experts in the field." Dkt 370, Declaration of Paul D. Boehm ("Boehm Decl") ¶ 10(a). Plains' expert Wade Bryant claims "… Dr. Mezic's calculation of oil volumes based on SCAT data is not reliable." Dkt. 371, Declaration of Wade Bryant ("Bryant Decl.") ¶ 7.

3.     However, the methodology that determines volume in $m^3$ per meter of shoreline is simple and has been used both by my team, and by Dr. Zack Nixon of RPI, another expert in the field,[1] to determine the volume in question. The methodology consists of multiplying thickness, width and percentage coverage to obtain volume using the data provided by the SCAT teams. The maxima of such volumes were determined for segments of the shoreline. The obtained maxima are

---

[1] See, Michel J, Owens EH, Zengel S, Graham A, Nixon Z, Allard T, Holton W, Reimer PD, Lamarche A, White M, and Rutherford N., "Extent and Degree of Shoreline Oiling: Deepwater Horizon Oil Spill, Gulf of Mexico, USA. PloS one. 2013 Jun 12;8(6):e65087. Not only was this article cited by Boehm in his declaration, but Boehm agreed that Dr. Nixon is a qualified oil spill scientist (Nov 2, 2017 Boehm Deposition Transcript ("Boehm Depo.") at p. 88:7-10).

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE

insensitive to cleaning efforts.  The SCAT categories have been designed to account for the uncertainty in the data by providing intervals that range in an order of magnitude (e.g. thickness of 1cm down to .1 cm) (NOAA Shoreline Assessment Manual 4th Edition, 2013.)

4.    The teams that collected SCAT data are experienced trained professionals.[2]  Thus, their measurements of thickness, width and percentage coverage are reliable.  The teams collecting SCAT data included a Plains representative who signed off on the measurement results (see, Boehm Depo., p. 80:7-18).  Dr. Nixon's results and my team's results on volumes are substantially the same, thus verifying the scientific soundness and robustness of our methodology.

5.    Dr. Boehm further claims "Mezic also categorizes shoreline segments into oiling categories based on his own system, which is inconsistent with SCAT and produces misleading results."  Dkt 370, Boehm Decl. ¶ 10(a).  Despite that criticism, Dr. Boehm then attempts to use precisely the same method for determining volumes in his own work.  *Id.* at ¶ 26.  However, by his own admission, Dr. Boehm is only "somewhat" familiar with the analysis of statistical distributions. Boehm Depo., p. 124:13-15.  As a result, his estimates of overlaps are severely overstated.

6.    For example, in the case of Light and Very Light categories, Dr. Boehm's analysis of the SCAT data claims my analysis "reclassifies 62% of the locations surveyed as Very Light as Light Oiling." Boehm Decl. ¶ 30.  Proper statistical analysis reveals, however, that only .4% of the overall segments were re-classified in my analysis.  The nature of the outliers is evident from the figure below:

---

[2]  "So they did a very, very thorough job.  That's how – that's how the Unified Command works.  Over many, many years, they've refined this process.  It's a very rigorous process."  (Boehm Depo., p. 42:10-14).

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE



7.    In fact, Dr. Boehm's statements on overlaps in his declaration are severely misleading given his own work on comparing categories from my work and SCAT categorization, shown in Dr. Boehm's "Table 1," below:

Table 1.  Comparison of Mezic's revised "SCAT categories" with reported SCAT categories (based on Mezic's Exhibit C)

| Reported SCAT category | Mezic revised "SCAT category" | | | | | |
|---|---|---|---|---|---|---|
| | Heavy | Moderate | Light | Very Light | NOO | Total |
| Heavy | 283 | 31 | | | | 314 |
| Moderate | 6 | 352 | | | | 358 |
| Light | | 118 | 42 | 21 | | 181 |
| Very Light | | | 8 | 2 | 3 | 13 |
| NOO | | | | | 60 | 60 |
| Light TB Oiling | | | 14 | 8 | 5 | 27 |
| Moderate TB Oiling | | | | 6 | | 6 |
| Negligible TB Oiling | | | 3 | 2 | | 5 |
| Undifferentiated Oiling | | 42 | 124 | | | 166 |
| No SCAT data | | 719 | 125 | | 1 | 845 |
| Total | 289 | 1262 | 316 | 39 | 69 | 1975 |

8.    A careful examination of Dr. Boehm's Table 1 reveals that the categorization using volumes is conservative compared with categorization using

SCAT tables, and confirms the small percentage of segments that changed category from Light to Very Light. Indeed, a comparison with my previous figure indicates the changes in category are due to data outliers.

9. Dr. Boehm's and Mr. Bryant's neglect of considering data outliers is unscientific, and neglects to pursue proper treatment of uncertainty in the underlying data (in severe contrast with their accusation that I have neglected uncertainties). It corresponds to the following analogy: assume we are measuring the speed of a baseball pitch. We measure that the speed is 100 miles per hour, 99 times. Then we measure it is 20 miles per hour, 1 time. The statement that the speed of the ball was 100 miles per hour is difficult to contest, statistically. But this is precisely what Boehm and Bryant do when they claim that SCAT outliers should somehow be treated on equal footing with other measurements, without doing any statistical analysis to prove this. To continue this example, the equivalent of Boehm's Figure 1 (Boehm Decl., p. 8) would be a Figure in which the range of possible baseball speeds would be from 20 to 100 mph, despite the fact that only 1 data point indicated the speed of 20 mph. This is not scientifically appropriate.

10. For these reasons, neither Dr. Boehm's nor Mr. Bryant's objections to my methodology (and to Dr. Nixon's methodology) – which they make ignoring sound and accepted premises of the underlying mathematics – are of any scientific significance.

**Inclusion of Other Sources of Oiling, Namely Natural Oil Seeps, Does Not Substantially Change the Results**

11. Dr. Boehm states that "Mezic fails to consider other sources of oil that appear on the same shorelines as does the Line 901 oil, particularly natural oil seeps, which were included in SCAT observations." (Dkt. 370, Boehm Decl. ¶10(b). Mr. Bryant states "Dr. Mezic's analyses do not distinguish between Line 901 oil and oil from non-Line 901 sources." Dkt 371, Bryant Decl. ¶ 11. This is

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

false.  In the modeling effort, we have considered the effect of natural seeps, at volumes available from the literature.  I stated an example of this in my deposition. Aug 18, 2017 Mezic Deposition Transcript ("Mezic Depo.) p. 119:18-120:22.

12.   In an effort to understand the impact of seep oil, we also calculated SCAT volumes obtained following the Line 901 spill at Coal Oil Point and obtained the following volumes: Coal Oil Point SCAT max: 4.200e-03 m^3/m; Coal Oil Point SCAT mean: 5.816e-04 m^3/m.[3]  Dr. Boehm states that Coal Oil Point historical oiling literature finds "maximum oil volume of $1.63 \times 10^{-4}$ m$^3$/m…. The average summer volume ($3.86 \times 10^{-5}$ m$^3$/m)… and the overall yearly average ($1.83 \times 10^{-5}$ m$^3$/m)".  Dkt. 370, Boehm Decl. ¶ 37.  Thus, the historical maxima and the average oiling at Coal Oil Point are, by Dr. Boehm's own analysis, *an order of magnitude less* than the oiling following the Line 901 spill.  For example, for the maxima it was: 4.200e-03/1.63e-4 = 25.8.  This means that the maximum oiling following the spill was **25.8 times larger** than the amount ever recorded in literature from natural seeps.

13.   Additional evidence also exists in the literature, such as Farwell C, Reddy CM, Peacock E, Nelson RK, Washburn L, and Valentine DL, "Weathering and the Fallout Plume of Heavy Oil from Strong Petroleum Seeps Near Coal Oil Point, CA.," Environmental Science & Technology, 2009 Mar 5; 43(10):3542-8. That article states that for the seeps in Santa Barbara channel "The patterns of sediment TPH abundance and surface currents suggest that most oil from the Coal Oil Point seeps is not transported large distances but rapidly weathers at the sea surface and then sinks to the sea floor."  This indicates that any natural seep contribution following the Line 901 spill on the shoreline would be a very small contribution to the overall total, and would not substantially change the oiling

---

[3]  Dr. Boehm and Mr. Fichera both testified that they did not know what the concentration of oil was at Coal Oil Point shortly following the Line 901 spill. (Boehm Depo., p. 54:7-10; Nov. 7, 2017 Fichera Deposition Transcript ("Fichera Depo.") p. 90:16-19.)

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

maxima.

### My Estimation of the Input Volume to the Model Matches Empirical Observations

14. Dr. Boehm states that the initial spill volume that reached the ocean was only 598 barrels. Dkt. 370, Boehm Decl. ¶ 44; Dkt 389-3, Declaration of Michael Fichera ("Fichera Decl.") ¶ 21. This number, if accurate, would be similar to the maximum natural seep amount ever recorded in the Santa Barbara Channel, which is around 600 barrels. Dkt 370, Boehm Decl. ¶ 5. If only 598 barrels of Line 901 oil reached the ocean, one would expect that the maximum oiling recorded at Coal Oil Point following the Line 901 spill would be *equal to* the maximum amount ever recorded from seep oil at Coal Oil Point. However, as noted in ¶ 13, above, the maximum oiling recorded at Coal Oil Point following the Line 901 spill was *25.8 times larger*.[4] Multiplying the 598 number by 25.8 we obtain the volume spilled into the ocean as 15,409 barrels. This is larger than the amount used in my calculations, but still is within the realm of possibility, if uncertainties in SCAT data are accounted for. Thus, while Dr. Boehm states that the initial volume I used does not match empirical observations, in fact it is Dr. Boehm who fails to use observational data that clearly invalidates his own initial volume estimate of 598 barrels, and validates the initial volume estimate used in my calculations.

15. Dr. Boehm states that my model is unreliable based on the initial volume that I used. Dkt. 370, Boehm Decl. ¶ 44. But the above calculation, based on SCAT data, shows that his estimate of 598 barrels reaching the ocean is a vast underestimate of the true spill volume. Indeed, Dr. Boehm admitted – despite

---

[4] As Mr. Fichera testified in his deposition, it "makes sense" that if the maximum oiling at Coal Oil Point after the spill was orders of magnitude larger than ever previously recorded from natural seeps at Coal Oil Point, then the spill was orders of magnitude larger than the volume from natural seeps. (Fichera Depo., p. 90:20-91:4.)

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

Plains' repeated suggestions to the contrary – he has no evidence whatsoever that the government has done anything to verify the total spill volume number (Boehm Depo., p. 164:14-19). And Mr. Fichera testified that the government has *not* agreed to the volume of oil that reached the ocean (Fichera Depo., p. 49:17-23). I have been told that the Federal and State government agencies still are working on the calculations of the amount of oil released and that reached the ocean.

16.    In the Figure below, I include an additional comparison of the SCAT data with the output of the model simulated with an initial volume of 598 barrels. As is evident, the initial volume of 598 barrels leads to a vast underestimate (between 1-2 orders of magnitude) of the SCAT data, consistent with the calculations in the previous paragraph.



17.    In contrast, the simulation with the initial volume of 10,750 barrels matches the observational data well.

18.    Additional evidence exists that Plains' estimate that only 598 barrels reached the ocean is wrong. In his deposition, Dr. Boehm testified that his initial volume of 598 barrels matches well with the amount of oil recovered. He also claims that over 500 barrels of oil was cleaned up. But given that Plains' experts assume that all of the oil cleaned was Line 901 oil, and that virtually all of the Line

901 oil was cleaned up, it leaves no room for any of the fate processes by which oil evaporates or degrades on the surface of the ocean. It also does not allow for the virtual certainty that nowhere near all of the oil was cleaned up. All of this is further evidence that Dr. Boehm's estimate of 598 barrels reaching the ocean is a severe underestimate.

**The Beaching and Unbeaching Module of My Model is State-of-the-Art**

19. Dr. Boehm states "Mezic's model, especially the newly developed beaching and unbeaching module, contains many flaws and unsupportable assumptions." (Boehm Decl., p. 2:22-24). Mr. Fichera also objects to the beaching and unbeaching module in my model (Fichera Decl. ¶¶ 25, 26).

20. However, Mr. Fichera admitted in his deposition that the model he and Dr. Boehm rely on, COSIM, utilizes the same, exponential in time modeling of unbeaching that I used (Fichera Depo., p. 56:1-57:9). This is the state of the art in modeling of beaching and unbeaching processes. It therefore is disingenuous to criticize that element of my model, when the same type of assumption is used in the COSIM model that Plains' experts rely on. In addition, the use of the beaching and unbeaching module in my model substantially corresponds to the SCAT data.

**Comparison of My Model Results with Empirical Observations Provides Strong Support for the Model**

21. Dr. Boehm states "Mezic's model produces results that completely disagree with empirical, real-world observations from multiple sources, and with findings of the Unified Command (UC)." Boehm Decl. ¶ 10(d). Mr. Fichera states "Comparisons of the locations and timing of observations of oil on the water surface and shorelines to the model results show a great amount of disparity." (Fichera Decl., p. 4:21-23).

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

22. However, the evidence Dr. Boehm and Mr. Fichera offer in support of these statements is deeply flawed. Critically, both Dr. Boehm and Mr. Fichera admit that, in opining on and criticizing the amount of oil I determined was on various shorelines at different times, they simply *looked at the video* – something I presented merely as a rough visual aid. That is, they did not utilize the actual numerical data outputs, despite these outputs being provided to them, and despite having the code to run my model themselves. Then, after criticizing that my model output didn't compare to 'real-world' oil volume data, they both admitted that the visual of the particles on the video are "ambiguous" (Fichera Depo., p. 59:24-60:3), and that they have no idea what volume of oil is represented by a dot on the screen (Boehm Depo., p. 102:24-103:1; Fichera Depo., pp. 60:1-3; 129:25-130:10.) Mr. Fichera even acknowledged that it is possible that the mass of a dot is very small, and that the calculation of volume "would be under the minimum category" (Fichera Depo., p. 60:4-7), and thus not visible by SCAT teams or in overflights. The conclusions reached by Dr. Boehm and Mr. Fichera – utilizing a rough visual aid rather than the actual numerical data output of my model – are not consistent with applicable scientific standards.

23. Moreover, Plains' modeling expert, Mr. Fichera, admitted that he had the ability to do a numerical output analysis, which is what I did, but that doing this "would require my team to do some significant amount of code work to generate the same output that he [Mezic] had done with his analysis. So it was a level of effort that we stopped work on" (Fichera Depo., p. 106:20-23). Plains' modeling expert did not undertake the necessary scientific analysis to rebut my work, even though he had all the information and data he needed to do it, if he chose to (Fichera Depo., p. 107:2-5). Such work would have yielded more precise data to compare than simply looking at a screen shot of a video (Fichera Depo., p. 107:8-15). Indeed, Mr. Fichera admitted that he had the ability to undertake the necessary analysis on a day-by-day, hour-by-hour basis (Fichera Depo., pp. 131:20-132:3),

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE

but he chose not to – and instead relied on his interpretation of "ambiguous" dots on a video screen.  Mr. Fichera therefore completely failed to produce a scientific comparison of the outputs of my model and the SCAT concentrations.

24.     Beyond this major error in Plains' experts' analysis, their analysis is further flawed.  For example, Boehm states that because he believes only 598 barrels reached the ocean, my model is "unreliable" (Boehm Decl., p. 17:12-15).  In fact, although Boehm erroneously suggests that the initial volume hitting the ocean has been agreed to by PHMSA, the government regulator, that number was estimated by Boehm, and the government has not agreed to it (see ¶ 15, above).  As shown above, the 10,750 barrel number I utilize corresponds much more closely to the observed oiling at Coal Oil Point than the oiling that would be produced by Boehm's spill volume of 598 barrels.  Dr. Boehm's criticism thus is self-contradictory: he argues my model is flawed based on his own estimate of initial volume, without comparing (by his own admission) the output of the model using his initial volume with the data.  If he had made the comparison, he would have found that his model output would be vastly less than shown by SCAT data.

### Plains' Experts Did Not Even Try to Compare Data Output From My Model With SCAT Data

25.     It is notable that, by their own admission, Dr. Boehm, Mr. Fichera and Mr. Bryant did not compare the outputs of my model with the available data, except for erroneously relying on their own estimate of the initial spill volume.  Since they had the source code and all the inputs, this was doable and possible in the time that they had available for performing this task.  Thus, all of their statements that attempt to find flaws in my model are sophistry.  They performed no analysis to disprove the alignment of my model outputs with the SCAT data.

///

///

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

26.     In addition, the Declarations of Dr. Boehm, Mr. Fichera and Mr. Bryant are full of mistakes and misleading statements about observational data. Many of these have been documented above.  As an additional example, in paragraph 49 of his declaration, Mr. Bryant states that "Mezic apparently assigned that oiling category on the basis of the volume of oil his model predicts, but he has not produced any data sets that reflect those volume outputs from his model."  This is not a true statement.  I did produce the data sets he is referring to, and they were provided to Plains counsel.  After making this inaccurate statement in his declaration, Bryant then admitted at his deposition that he did not actually know what data I had produced.  He "made the assumption" that I had not produced the data, but admitted that he never asked for it and that Plains' counsel did not give it to him.  Bryant Dep. 219:16-221:21.

### Impact on Ventura, Los Angeles and Orange Counties

27.     Mr. Bryant states that "Dr. Mezic's model predicts that oil from Line 901 had a major impact on the Channel Islands, as well as stretches of coastline in Ventura, Los Angeles, and Orange Counties. The model thus contradicts observations made by response personnel and predicts shoreline oiling never reported to the US Coast Guard during the responses." (Bryant Decl. ¶ 10).

28.     However, Mr. Bryant has no scientific basis for making such statements since, by his own admission, he did not look at the output of the model, but simply looked at the video – which was nothing more than a visual aid.  As Plains' experts acknowledged, oil fingerprinted to Line 901 was found in Manhattan Beach in late May, 2015 (see, e.g., Boehm Depo., p. 153:7-11).

29.     In addition, there are numerous reports of oiling in the counties that Bryant lists during the Line 901 spill (see, e.g., Supplemental Environmental Incident Report South Bay Incident, Prepared By:  Steve Gibson, Environmental Scientist, California Department of Fish and Wildlife Office of Spill Prevention and

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

Response, 4665 Lampson Ave., Ste. C, Los Alamitos, CA 90720).

## The Model Selected (MEDSLIK-II) and Modification Provide an Industry Standard Analysis

30.    Dr. Boehm and Mr. Fichera admit that they have no experience with the MEDSLIK model and have never evaluated its results.  (Boehm Depo., p. 134: 7-9; Fichera Depo., p. 11:1-5).  Mr. Fichera states that the model and "Dr. Mezic's code modifications do not provide 'industry standard' oil spill modeling, as he had claimed.  Rather, the model contains antiquated methods that add to the uncertainty regarding the accuracy of the results." (Fichera Decl., p. 4:15-18).  That is not correct.

31.    MEDSLIK is currently used in major efforts to track and monitor oil spills (UReady4OS; Ready for the oil Spill; European Union and DG-ECHO (2018); http://www.medess4ms.eu/oil-spill-models).  A group of authors that includes professors from the Massachusetts Institute of Technology use it in their recent study (De Dominicis M, Falchetti S, Trotta F, Pinardi N, Giacomelli L, Napolitano E, Fazioli L, Sorgente R, Haley Jr PJ, Lermusiaux PF, and Martins F; "A Relocatable Ocean Model in Support of Environmental Emergencies. Ocean Dynamics. 2014 May 1;64(5):667-88).  The Mediterranean Decision Support System for Marine Safety web site calls it the "well established standalone oil spill system."  It was featured recently in one of the high impact Nature publications "*Multidisciplinary oil spill modeling to protect coastal communities and the environment of the Eastern Mediterranean Sea*. Tiago M. Alves; Eleni Kokinou, George Zodiatis, Hari Radhakrishnan, Costas Panagiotakis & Robin Lardner. Scientific Reports 6, Article number: 36882 (2016); doi :10.1038/."  Oil-producing states are using it for National Training Courses (http://rempec.org/rempecnews.asp?NewsID=78).  MEDSLIK has been reviewed in major books on Oil Spills (Oil Spill Response: A Global Perspective, edited by Walter F. Davidson, Kenneth Lee, Andrew Cogswell; notably COSIM is absent).

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

To state that the extension of the MEDSLIK model does not meet industry standards, and at the same time provide no evidence that their own model, COSIM, has any significant peer review, is again disingenuous.

**There is No Mathematical Mistake in the Model**

32.    Mr. Fichera claims that there is a mistake in my model (Fichera Decl., pp. 5-9).  However, when stating that the MEDSLIK model uses the horizontal diffusion coefficient in the formula (Fichera Decl., p. 5:17-19), he erroneously assumes that the coefficient we used is the variance of the process.  In fact, my team did not directly copy the MEDSLIK code.  We instead used the standard deviation – which is the square root of the variance.  This is the standard when the Ito calculus is used in modeling stochastic transport processes.  However, both Mr. Fichera and Dr. Boehm admitted in their depositions that they do not know what the Ito calculus is (Fichera Depo., p. 18:18-20; Boehm Depo., p. 153:24-25).  Mr. Fichera's lack of background in stochastic process theory disqualifies him from being able to assess mathematical elements of the model.  No error exists in the diffusion coefficient parameter.

33.    After Mr. Fichera makes his mathematical mistake, he proceeds to test his "theory" of my alleged error.  He takes my model and produces the output shown in his Figure 1, labeled "CORRECTED" (Fichera Decl., p. 7).  Despite the fact that his team clearly was able to run my software, Mr. Fichera claims he was not able to compare shoreline concentrations with SCAT data.  It is instructive to compare the output of the model when using the standard deviation that Mr. Fichera uses.  The figure is below.

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE



34.    The output clearly underestimates the SCAT data, once again proving that Mr. Fichera's "CORRECTED" model is simply wrong, and does not correspond to actual evidence. Note that the volume used here is 10,750 barrels. If we used the smaller volume of 598 barrels, as suggested by Dr. Boehm, the difference would be even bigger.

35.    When asked about this in his deposition, Mr. Fichera conceded that his "corrected" model *frequently showed no oil on the shoreline even where SCAT data said there was oil*. (Fichera Depo., pp. 105:24-106:3).

**The Model Inputs Utilize Appropriate Current and Wind Data**

36.    Mr. Fichera states that "Two key inputs, current and wind data, are incomplete and insufficient for the task, rendering the model output unreliable." (Fichera Decl., p. 10:12-13.) He criticizes the current data for it's distance from the shoreline. However, he was *unaware* of the fact that UCSB added a HF radar antenna close to the spill site precisely for this purpose (Fichera Depo., p. 35:9-12; see Harlan J, Terrill E, Hazard L, Otero M, Roarty H. "The Integrated Ocean

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE

Observing System HF Radar Network; OCEANS'15 MTS/IEEE Washington 2015 Oct 19 (pp. 1-4) IEEE).  I utilized this data that Mr. Fichera didn't know existed.

37.    Mr. Fichera alleges that the wind data was "neither appropriate nor sufficient to simulate a nearshore event such as the Line 901 release." (Fichera decl., p. 10:19-20.)  However, the wind data was adopted from COAMPS – the Coupled Ocean/Atmosphere Mesoscale Prediction Systems developed and used by the US Navy to pursue prediction on scales much finer than the scales necessary in the current work:

> "COAMPS was developed by the Marine Meteorology 43Division (MMD) of the Naval Research Laboratory (NRL). The atmospheric components of COAMPS are used operationally by the U.S. Navy for short-term numerical weather prediction for various regions around the world. It represents an analysis, now cast and short-term (up to 72 hours) forecast tool applicable to any given region of the earth."
> (http://www.worldwindsinc.com/services/atmospheric-modeling/coamps.htm)

38.    We utilized standard interpolation methods to provide sub-resolution results.  This is a standard scientific practice, and Mr. Fichera admits he has used the same methodology in his own work (Fichera Depo., pp. 30:11-17; 31:12-19). In fact, Mr. Fichera admitted in his deposition that if the wind speed changes smoothly, then the error induced by the resolution used in my model is small (Fichera Depo., pp. 42:20-43:2). Thus, by his own acknowledgment, further refinement of the wind resolution would not substantially change the result.[5]

---

[5]  Mr. Fichera claims he has a wind database with finer resolution, but he admitted that it is *not* publicly available, and has *not* been peer reviewed (Fichera Depo., pp. 43:9-18).

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

**The Fate Processes in the Model Are Appropriately Represented**

39.     Mr. Fichera states that fate processes are inappropriately represented in my model (Fichera Decl., ¶¶ 27-30).  However, these fate process models are in wide use, by governments and by researchers at the Massachusetts Institute of Technology.  They are peer reviewed and subject to wide scientific scrutiny, in contrast to Mr. Fichera's COSIM model that is proprietary and not subject to scientific scrutiny.

40.     Besides the already discussed beaching and unbeaching model, which Mr. Fichera admitted in his deposition is the same as the one he uses in COSIM, Mr. Fichera takes particular issue with my use of the entrainment model.  However, we have checked our entrainment model against NOAA's software ADIOS and produced that material.  If we were to implement the model that Fichera suggests, the overall difference in the output would be 0.3%.  Since both models are still in use, it is far from clear which one is more accurate, but use of either does not substantially modify the results.

**The Model Provides Precise Information on Location and Timing**

41.     A careful examination of the model output indicates that the timing and location of oil trajectory reflects the actual timing and trajectory of the oil from the spill, as reported by various sources. For example, the model shows substantial oil reaching northern Orange County on May 27th, which matches reports of oil there (Supplemental Environmental Incident Report; South Bay Incident). A later fingerprinting result confirmed that oil was from Line 901. The model also shows substantial amounts of oil present in southern Orange County on June 4, which matches reports of oil there (https://patch.com/california/newportbeach/mysterious-tar-balls-wash-ashore-orange-county). These are the southernmost locations considered by the model, and the furthest from the spill site, and yet the timing and location of the model prediction coincides with the observations of oil on the shore.

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

42.     In addition to confirming that the location and timing of the oil trajectory from the model are correct, these facts also disprove two other assertions made by Plains' experts.  First, Mr. Bryant asserts that my Figure 2 shows moderate oiling in Los Angeles and northern Orange counties, and that it is "very unlikely" such oiling would have gone unreported (Bryant Decl., p. 25:15-17). That assertion is contrary to the facts. There was reporting, data collection and fingerprinting that confirm my model results along that stretch of coastline.

43.     Second, Mr. Fichera states that "testing of 100 iterations of dispersion transport in a single direction yielded an error of 128 km in one hour of the simulation time" (Fichera Decl., p. 6:6-7). However, 128 km is approximately the distance from the spill site to Manhattan Beach, and the model shows a substantial amount of oil arriving there in *8 days*, not 1 hour.

**Fingerprinting Results Confirm My Model Prediction**

44.     Plains alleges that I ignore all fingerprinting results (Dkt. 379-1, Mtn. to Strike, p. 23:4-5), and Dr. Boehm states "Fingerprinting results from the Los Angeles County area also disagree with the model results. Fingerprinting is a critical part of understanding an oil spill, especially for this spill, where naturally occurring oil seeps result in the presence of significant quantities of non-spill oil. Mezic, however, did not validate his model using fingerprint results." (Boehm Decl., ¶ 63.). Dr. Boehm confuses the issues of validation and model verification. Validation of the MEDSLIK model was done over the history of its development. Validation of the COAMPS wind input was done by the Navy. Validation of the current input was done by me in my first declaration using overflight data. We have compared the result of the model with fingerprinting results, for verification. On every location where fingerprinting indicated there was Line 901 oil, our model also placed 901 oil there, prior or on the date the sample was taken. As such, our model is completely consistent with fingerprinting results. In fact, Dr. Boehm

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE

misstates the evidence: fingerprinting *did* show Line 901 oil was present on Los Angeles beaches, at the location where our model predicted Line 901 oil would be.

## My Model is Capable of Measuring the Volume and Location of Oil Above the Mean High Tide Line

45.     Plains claims that my model cannot show where oil landed above the mean high-tide line. Dkt. 368-1, Opposition to Renewed Motion for Class Certification ("Opposition") at 6:7-12, citing a statement from my deposition.  This is false, and Plains misconstrues my testimony.  Its allegation also reveals a fundamental misunderstanding of the difference between being able to determine whether *any* oil went above the mean high tide line, and whether a *particular particle of oil* went above the mean high tide line.

46.     The model I developed is capable of producing the concentration of oil above the mean high tide line, at any chosen time and for any segment of the shoreline.  The physical process of deposition of oil on the shoreline leads to a percentage of the concentration being deposited above the mean high tide line. Therefore, it is possible to estimate the concentration of oil above the mean high tide line with the model as is.  In all cases, some amount of oil was deposited above the mean high tide line on all shoreline segments that were oiled.

47.     In future work, cleaning data will be incorporated to provide analysis of the volume and duration of the stay of oil above the mean high tide line.

## Additional Analyses to be Performed

48.     In my declaration, I described how I modeled the relevant transport determining where the oil flowed and how I modeled the fate of the oil (*i.e.*, how the oil changed over time).  I provided an analysis of maximum oiling on the shoreline from Santa Barbara to Orange County.  I also provided an analysis of the

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF
RENEWED MOTION FOR CLASS CERTIFICATION
AND IN OPPOSITION TO MOTION TO STRIKE

collected SCAT data, and a comparison of SCAT data with the outputs of my model.

49.    The remaining work involves (1) incorporating the cleanup data in the model; (2) determining the duration of oil present on a particular segment of the shoreline; (3) determining the duration of oil present on the surface of the ocean; (4) determining the amount of oil present on particular segments above the mean high tide line; and (5) estimating the precise impact of natural seeps during the Line 901 spill (for this we will continuously release volumes of oil from the sea floor, available from literature, and determine the concentration profile on the coastline, to further validate the accuracy of our estimates of the minimal impact that natural seeps had during the Line 901 spill).

50.    The data necessary to perform this work is or will become available.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Santa Barbara, California, this ___1st___ day of December, 2017.

_____
IGOR MEZIĆ

4819-2234-2999 v.4

REBUTTAL DECL. OF IGOR MEZIĆ IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE